UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

RYAN JAMES BROUSSARD          CIVIL ACTION NO. 6:16-cv-01546

VERSUS                        JUDGE TRIMBLE

U.S. COMMISSIONER,            MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

## ADMINISTRATIVE  PROCEEDINGS

Claimant Ryan James Broussard fully exhausted his administrative remedies

before filing this action in federal court.  He filed an application for Supplemental

Security Income benefits ("SSI"), alleging disability beginning on February 1, 2012.[1]

His application was denied.[2]  The claimant requested a hearing, which was held on

January 6, 2015 before Administrative Law Judge Rowena DeLoach.[3]  The ALJ

---

[1]     Rec. Doc. 7-1 at 126.

[2]     Rec. Doc. 7-1 at 57.

[3]     The hearing transcript is found at Rec. Doc. 7-1 at 33-56.

issued a decision on March 31, 2015,[4] concluding that the claimant was not disabled within the meaning of the Social Security Act from the date of the application through the date of the decision. The claimant requested review, but the Appeals Council found no basis for review of the ALJ's decision.[5] Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review, pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on October 1, 1982.[6] At the time of the ALJ's decision, he was thirty-two years old. He completed the ninth grade[7] and worked a variety of jobs for short periods of time over the course of several years.[8] He alleged that he has been disabled since February 1, 2012[9] due to schizoaffective disorder, ADD, anxiety, shoulder problems, vision problems, and chronic sinusitis.[10]

---

[4]     Rec. Doc. 7-1 at 17-27.

[5]     Rec. Doc. 7-1 at 4.

[6]     Rec. Doc. 7-1 at 126.

[7]     Rec. Doc. 7-1 at 36.

[8]     Rec. Doc. 7-1 at 138-139, 148.

[9]     Rec. Doc. 7-1 at 126.

[10]     Rec. Doc. 7-1 at 146.

The claimant sought treatment at the Dr. Joseph Henry Tyler Mental Health Center in Lafayette, Louisiana, on May 21, 2009,[11] primarily complaining about a problem with his temper. He gave a history of a severe head injury with multiple facial injuries from a 2003 motor vehicle accident and childhood diagnoses of attention deficit hyperactivity disorder and bipolar disorder. He was taking Lexapro, Seroquel, and Depakote but control of his symptoms was complicated by substance abuse, including the use of alcohol, marijuana, crack cocaine, and methamphetamines. He was diagnosed with Bipolar Disorder N.O.S., ADHD, and Polysubstance Dependency. His Global Assessment of Functioning ("GAF") score was 30.[12] Although he was calm and cooperative when evaluated, he had lost his temper when his mother refused to give him money to buy drugs, and he had violently destroyed furniture in their home. He reported having had suicidal ideation approximately two weeks earlier. He was admitted to the LSU-UMC Psychiatric Unit

---

[11] Rec. Doc. 7-1 at 410-423.

[12] The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. A GAF score in the range of 21 to 30 indicates behavior that is considerably influenced by delusions or hallucinations or a serious impairment in communication or judgment or an inability to function in almost all areas (e.g., stays in bed all day, no job, no friends). The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).

for medication management and mood stabilization services and then referred to outpatient mental health and substance abuse clinics. Although the treatment notes lack clarity, Mr. Broussard later gave a history of having received a week of in-patient treatment at the Tyler Mental Health Center in 2009 before starting out-patient treatment.[13] A treatment plan from Tyler Mental Health dated May 26, 2009, indicates that the claimant began sobriety on that date.[14]

On June 8, 2009,[15] the claimant reported feeling better with a change in medication, indicating that he had trouble in the past with working because he was unable to stay focused. He reported that he was more able to focus and stay on task when taking Strattera.

On August 10, 2009, the claimant reported to his therapist at the Tyler Center that he was taking his medications as prescribed, maintaining his sobriety, and changing his group of friends to avoid those who use. He denied suicidal ideation, homicidal ideation, and hallucinations.

---

[13]     Rec. Doc. 7-1 at 465.

[14]     Rec. Doc. 7-1 at 347-348.

[15]     Rec. Doc. 7-1 at 409.

On August 31, 2009, the claimant was seen by a nurse at the Tyler Center with regard to his medications.[16] That same day, he saw Dr. George W. Diggs, Jr. at the Tyler Center. His mother told Dr. Diggs that the claimant became manic when his Depakote level was decreased and threw away his medications. The claimant also reported some confusion when playing a video game and some nausea and vomiting. The claimant denied suicidal or homicidal ideation and indicated that he did not need to be in the hospital. His Depakote dosage was increased.

The claimant again saw a nurse at the Tyler Center on September 14, 2009, and reported that his symptoms were stable.[17] He claimed to be medication compliant without any side effects.

On October 7, 2009, the claimant saw a counselor at the Tyler Center.[18] He reported a history of poor concentration dating back to at least age fourteen and indicated that Strattera was helpful in that regard. He reported attending a recovery group that meets at a local church and maintaining his sobriety. However, he also reported periods of short term depression without suicidal or homicidal ideation.

---

[16]      Rec. Doc. 7-1 at 407.

[17]      Rec. Doc. 7-1 at 405.

[18]      Rec. Doc. 7-1 at 404.

On December 3, 2009, the claimant again saw another counselor at the Tyler Center, Licensed Clinical Social Worker Debra Milson,[19] and he continued counseling sessions with Ms. Milson on a regular basis for several years. At their first appointment, Mr. Broussard reported taking his medication as prescribed and he denied suicidal ideation, homicidal ideation, and hallucinations; at subsequent appointments, those same averments were reported unless noted otherwise in this report. Mr. Broussard complained about a reduction in medication that resulted in agitation, and his mother reported that he was agitated and somewhat manic, but the claimant did not want to increase the medications. They discussed the accident in which he sustained a head injury, his anger toward others, and past hurtful incidents.

The claimant saw psychiatrist Dr. Lindsay A. Legnon at the Tyler Center on December 7, 2009.[20] Since a recent decrease in his Depakote dosage, Mr. Broussard was experiencing mood swings and irritability. Absent any signs of Depakote toxicity, Dr. Legnon returned him to the previous dosage. His mood was irritable, his affect was constricted, but his thought processes were organized, and he reported no suicidal ideation.

---

[19]     Rec. Doc. 7-1 at 403.

[20]     Rec. Doc. 7-1 at 402.

The claimant returned to the Tyler Center and saw Ms. Milson on January 4, 2010.[21] He reported some agitation as well as an incident with his father that almost became violent. They discussed his anger and the danger of drinking while taking psychotropic medications.

The next session with Ms. Milson was on January 22, 2010,[22] and the claimant's parents participated as well in an effort to deal more effectively with the claimant's episodes of anger and other behavioral concerns.

A new treatment plan was executed on February 18, 2010 for the upcoming six months.[23] The claimant saw his counselor Ms. Milson that same day. He reported that he was taking his medications as prescribed; and advised that he was doing much better with anger management. The claimant next saw his counselor on March 12, 2010,[24] and he reported having fewer incidents with his parents.

On April 16, 2010, the claimant saw Ms. Milson following an incident at his grandparents' camp during which he became aggravated and upset with his girlfriend and grandparents. Different ways to manage his anger were discussed.

---

[21]     Rec. Doc. 7-1 a 401.

[22]     Rec. Doc. 7-1 at 400.

[23]     Rec. Doc. 7-1 at 343-345.

[24]     Rec. Doc. 7-1 at 397.

On May 17, 2010, the claimant saw the nurse at the Tyler Center for blood work[25] and also saw Dr. Legnon.[26] The claimant denied suicidal ideation, homicidal ideation, and hallucinations but reported having been depressed for three weeks. He displayed a depressed mood, a tearful affect, and was irritable. He described crying spells and a decrease in interest in activities he previously enjoyed. His relationship with his girlfriend was a stressor, he was frustrated at being denied disability benefits, and he felt decreased self esteem because he was not employed. He also described racing thoughts and anxiety.

The claimant returned to the Tyler Center for counseling with Ms. Milson on May 17, 2010.[27] He left the clinic while waiting to be seen, but his mother was able to get him calmed down and bring him back in to see the doctor for a medication adjustment. He discussed the possibility of getting a job, problems with his girlfriend and cousin, and his continued depression.

The claimant saw his counselor again on June 14, 2010.[28] He reported having broken a toe kicking a ceramic pot while trying to avoid conflict with a neighbor and

---

[25]      Rec. Doc. 7-1 at 398.

[26]      Rec. Doc. 7-1 at 395.

[27]      Rec. Doc. 7-1 at 394.

[28]      Rec. Doc. 7-1 at 393.

reported having broken up with his girlfriend.  He again discussed employment but his counselor noted that he was "[l]imited in the type of part-time employment due to brain injury and ability to interact and function."

Another treatment plan was executed on September 1, 2010.[29]  The claimant also saw his counselor that day and reported "getting agitated about every little thing" but also reported that he was "doing pretty good."

The next appointment with his counselor was on December 13, 2010.[30]  He reported having anxiety, and they discussed differentiating symptoms of anger from symptoms of anxiety.  The claimant reported having been charged with possession of marijuana in May 2010 and requested substance abuse counseling.  He admitted having thoughts of hurting others while angry that went away after he calmed down.

On December 13, 2010, Dr. Legnon met with the claimant and his mother.[31]  They discussed his anxiety, irritability, and decreased sleep.  The claimant reported medication compliance and avoidance of drugs and alcohol.  Dr. Legnon adjusted his medications.

---

[29]     Rec. Doc. 7-1 at 340.

[30]     Rec. Doc. 7-1 at 391.

[31]     Rec. Doc. 7-1 at 390.

The claimant returned to the Tyler Center for counseling with Ms. Milson on January 21, 2011.[32] He reported that his court appearance went well and he intended to comply with all requirements before the next court date in April. They discussed anger management techniques, and the claimant reported doing better on new medications.

The claimant's next counseling session was on March 9, 2011.[33] He and his mother reported an improvement in his symptoms since a recent medication change.

At his next appointment with Ms. Milson on April 27, 2011,[34] the claimant reported having hallucinations since being drug-free, increased paranoia, and some agitation. He was frustrated about not being able to find work. He also reported that Vistaril caused dizziness, and he expressed concern about being able to work while dizzy. The claimant met with Dr. Legnon that same day,[35] and reported that he had experienced lifelong auditory hallucinations except while using drugs and that the hallucinations had worsened over the past few months. He reported moving the furniture in his room around because of the voices he hears. He also admitted being

---

[32]     Rec. Doc. 7-1 at 389.

[33]     Rec. Doc. 7-1 at 388.

[34]     Rec. Doc. 7-1 at 387.

[35]     Rec. Doc. 7-1 at 386.

paranoid but denied significant mood symptoms. He reported that he was taking his medications as prescribed and maintaining his sobriety. Dr. Legnon increased his Seroquel dosage, continued his other medications, and changed her diagnosis to Schizoaffective Disorder, Bipolar Type.

The claimant missed his appointment with his counselor on May 18, 2011[36] but saw her again on June 6, 2011.[37] They discussed Dr. Legnon's change of diagnosis, his paranoia and auditory hallucinations, his sensitivity to loud noises, as well as incidents in which the claimant became agitated and yelled at his mother.

The claimant returned to see his counselor on July 5, 2011.[38] He reported that he was continuing to hear music in the background although he claimed that it no longer interfered with his functioning. He reported an incident in which he became upset with a neighbor, and he became upset again while talking about it. They discussed continuing to work on eliminating explosive episodes. His mother reported that the claimant had difficulty not becoming aggressive. The claimant was agreeable to trying to think things through before taking action.

---

[36]    Rec. Doc. 7-1 at 385.

[37]    Rec. Doc. 7-1 at 384.

[38]    Rec. Doc. 7-1 at 383.

On September 8, 2011, the claimant again saw Dr. Legnon[39] and reported that he had been doing well until he moved out of his parents' home and in with friends about two weeks earlier. While there, the claimant became very depressed and suicidal, his friends were taking advantage of him, stealing his medications, and using drugs. The claimant reportedly maintained his sobriety, and his parents moved him back home. His suicidal ideation resolved, and his appetite and energy level were low but improving. He reported continuing to take his medication as prescribed.

The claimant saw Dr. Legnon again on December 8, 2011.[40] He reported problems with sleep maintenance, a mild increase in paranoia, and occasional auditory hallucinations, but no mood symptoms. He was taking his medication as prescribed and maintaining his sobriety. Dr. Legnon adjusted his Seroquel dosage.

The claimant canceled the counseling session scheduled for December 14, 2011[41] but saw her on January 19, 2012.[42] He reported taking his medications as prescribed, denied paranoia, denied explosive episodes, but was still moving the

---

[39]     Rec. Doc. 7-1 at 382.

[40]     Rec. Doc. 7-1 at 381.

[41]     Rec. Doc. 7-1 at 380.

[42]     Rec. Doc. 7-1 at 379.

furniture around. He had paid all the fines related to the marijuana charge. They discussed strategies for calming himself.

On February 16, 2012, the claimant again saw his counselor, Ms. Milson.[43] He reported hearing the voices of children playing, which was relieved with Seroquel. He also reported moving his furniture again, and his mother reported that he became angry when anyone mentioned that behavior. He denied any outbursts, and reported compliance with his medication regimen. He rated his functioning as a seven on a ten-point scale but also reported challenges with following his mother's instructions.

The claimant again saw Ms. Milson on March 27, 2012.[44] He reported increased anxiety and distress related to his father's depression.

On May 22, 2012, the claimant again saw his counselor[45] and reported difficulty with concentrating and focusing. His mother reported paranoid thinking. The claimant admitted that he was isolating himself and being careful about interactions with others as well as irritability with others. He also reported an improvement in symptoms with a higher dose of Strattera. The counselor noted, however, that the claimant was not able to work as he cannot focus and follow

---

[43]     Rec. Doc. 7-1 at 283.

[44]     Rec. Doc. 7-1 at 282.

[45]     Rec. Doc. 7-1 at 280.

instructions at all times, gets agitated in a work environment, and does not always understand what is being requested from him.

On June 19, 2012, the claimant again saw his counselor.[46] He admitted having some paranoia but denied that it was intense. He reported that his concentration had improved greatly with the change in the Strattera dosage. He indicated that he was finding things to do and taking his medication as prescribed.

On September 18, 2012, the claimant returned to see Ms. Milson.[47] He reported that his parents were having health issues, and he was assisting them. He indicated a desire to work but an inability to manage job tasks. He denied paranoid thinking and hallucinations.

The claimant again saw Ms. Milson on October 16, 2012[48] and reported a few episodes of anger and upset and an episode of paranoia that resulted from being in a hospital waiting room with several people.

On October 2, 2012,[49] the claimant was seen in the ophthalmology clinic at University Medical Center ("UMC") in Lafayette, Louisiana, with regard to an eye

---

[46]    Rec. Doc. 7-1 at 280.

[47]    Rec. Doc. 7-1 at 279.

[48]    Rec. Doc. 7-1 at 278.

[49]    Rec. Doc. 7-1 at 330-331.

infection related to injuries sustained in the motor vehicle accident in May 2003, when he sustained an orbital fracture that required the installation and then removal of hardware and the placement of a stent in a tear duct. A week later,[50] he was seen in UMC's ENT Clinic for the same problem, which was described as a recurrent infection of the lacrimal duct. He was also diagnosed with a septal deviation and chronic sinusitis and prescribed medications. On October 23, 2012, a CT scan of his sinuses was conducted, which showed diffuse chronic sinusitis, an occlusion of the left ostiomeatal unit, and rightward deviation of the nasal septum.[51] On October 30, 2012, the claimant was seen in the ophthalmology clinic again and it was decided that he would have a surgical procedure for revision dacryocystorhinostomy, septoplasty, and functional endoscopic sinus surgery.[52]

On October 31, 2012, the claimant was seen in the orthopedics department at UMC with regard to bilateral shoulder injuries sustained in the 2003 motor vehicle accident.[53] The treatment note indicated that he complained of weakness, a decreased range of motion, and minimal pain in his shoulders. X-rays showed that both

---

[50]     Rec. Doc. 7-1 at 329.

[51]     Rec. Doc. 7-1 at 326-327.

[52]     Rec. Doc. 7-1 at 318-322.

[53]     Rec. Doc. 7-1 at 323-325.

shoulders were within normal limits.  The doctor observed scapular winging on the right, atrophy of the serratus anterior and trapezius especially on the right, and possible long thoracic nerve dysfunction.  The claimant was given home exercises for his shoulders and upper back.

The claimant saw Dr. Legnon on November 2, 2012.[54]  His affect was appropriate, his mood was euthymic, and his attitude was cooperative.  He reported an episode of paranoia during his father's surgery, which resolved that day.  He reported that his focus improved with a higher dose of Strattera, but he was recently diagnosed with hypertension, a possible side effect of that medication.  He reported that he had scheduled nasal surgery due to his past injury.  He reported that he was maintaining his sobriety.

On November 14, 2012, the claimant saw Ms. Milson.[55]  He had been off Strattera for two weeks to determine if it was causing his high blood pressure, and he reported a deterioration in his ability to focus and follow through with tasks.  He admitted paranoid thinking, a tendency to look around when visiting with others, and an inability to enter and move about in a store without a parent being present.

---

[54]    Rec. Doc. 7-1 at 275.

[55]    Rec. Doc. 7-1 at 274.

On November 21, 2012, the claimant was seen again at UMC with regard to his tear duct issue.[56] Dr. Peter McGuire's treatment note showed that a CT scan of the claimant's face revealed bilateral mastoid and anterior ethmoid disease, a septal deviation on the right, and a left concha bullosa. The CT scan also showed that the left nasolacrimal duct was obstructed. Surgery was scheduled for November 30, 2012 for revision dacryocystorhinostomy, septoplasty, and functional endoscopic sinus surgery with image guidance. The surgery was performed on November 30, 2012,[57] and Mr. Broussard had a follow up visit with Dr. McGuire and removal of the packing on December 4, 2012.[58] He again followed up on December 12, 2012.[59]

On January 3, 2013, the claimant again saw his counselor, Ms. Milson.[60] He reported that he was taking his medications as prescribed, reported some shaking in his hands that might need to be addressed with Dr. Legnon, and reported that he was handling stressful situations with few problems. They discussed strategies for not getting upset and calming himself when faced with anxiety and stress.

---

[56]     Rec. Doc. 7-1 at 314-315.

[57]     Rec. Doc. 7-1 at 301-313.

[58]     Rec. Doc. 7-1 at 300.

[59]     Rec. Doc. 7-1 at 299.

[60]     Rec. Doc. 7-1 at 273.

On January 30, 2013, the claimant was seen in the ENT Clinic at UMC complaining of triple vision.[61]  He had no nasal complaints but needed a new glasses prescription.  He was encouraged to see an ophthalmologist and was referred to the Medicine Clinic for hypertension.

On March 11, 2013, Ms. Milson filled out an evaluation form indicating that the claimant had a moderate level of need.[62]  Her treatment note indicated that he reported taking his medications as prescribed, had continued problems with his blood pressure, experienced shaking in both hands, but reported no episodes of aggression. The claimant saw Dr. Legnon that same day,[63] and she indicated that his hand tremor might be a side effect of the Depakote.

On March 19, 2013, the claimant was seen at UMC for his hypertension.[64]

Ms. Milson filled out an assessment on May 7, 2013,[65] in which she stated that the claimant was prescribed Depakote and Seroquel for his mood disorder and Strattera for his ADHD.  She stated that the highest grade he completed in school was ninth grade, and that he had difficulties reading and writing.  She also indicated that

---

[61]     Rec. Doc. 7-1 at 298.

[62]     Rec. Doc. 7-1 at 284, 336-337.

[63]     Rec. Doc. 7-1 at 271.

[64]     Rec. Doc. 7-1 at 297.

[65]     Rec. Doc. 7-1 at 364-368.

he had problems with basic needs including food, shelter, funds, and healthcare although he was supported by family. She noted that he stutters at times, his speech was slow, his mood was anxious, his affect was appropriate. He reported racing thoughts at times but not continuously. She noted impaired concentration, impaired recent memory, borderline intellectual functioning, impaired judgment, and a traumatic brain injury. She also noted that, in the past, he had anger issues and was suicidal. She estimated his risk of harm to himself or others as low but not minimal.

On May 13, 2013,[66] the claimant told Ms. Milson that he had been having problems for the previous two to three weeks including triple vision, compulsively moving things around, confusion, an inability to concentrate during conversations with others, anger, and agitation. These changes were attributed to a medication change. The claimant admitted that when he was off the Depakote he had thoughts of suicide and homicide as well as hallucinations. Mr. Broussard also saw Dr. Legnon that same day,[67] and his mother described him as a ticking time bomb.

The claimant and his parents again saw Dr. Legnon on May 23, 2013 for medication management.[68] An increase in his Depakote dosage resulted in the return

---

[66]     Rec. Doc. 7-1 at 269.

[67]     Rec. Doc. 7-1 at 361.

[68]     Rec. Doc. 7-1 at 262.

of tremors, dropping things, and confusion but no manic symptoms. The claimant reported auditory hallucinations on several recent occasions. His triple vision had resolved. Dr. Legnon described his symptoms as mild, and she adjusted his medication dosages.

On July 16, 2013, the claimant was again seen in the ENT Clinic at UMC, following up on his recent surgery and left eye drainage.[69]

The claimant returned to see his counselor on July 19, 2013.[70] He admitted to possible auditory hallucinations in the prior week as well as agitation in interactions with others. He reported tending to become upset with his parents. His mother purportedly monitored his behavior and gave him additional medication for anxiety when necessary.

The claimant was seen at UMC's ENT Clinic on August 13, 2013, again complaining about discharge from his left eye.[71] He was prescribed medications and the plan was to remove the tear duct stent on his next visit.

---

[69]    Rec. Doc. 7-1 at 295-296.

[70]    Rec. Doc. 7-1 at 268.

[71]    Rec. Doc. 7-1 at 294.

On August 16, 2013,[72] the claimant reported to Ms. Milson a recent incident during which he cursed out an elderly woman who was visiting his home, admitted to getting agitated with no apparent precipitant, and admitted to paranoia. His father reported that the claimant sometimes seems to be somewhere else and not in the moment. The claimant also saw Dr. Legnon the same day.[73] He requested a reevaluation of his substance dependency diagnosis to reflect his years of sobriety.

On October 30, 2013,[74] the claimant met with Ms. Milson and denied any anxiety attacks or agitation since their last session. He reported having medical problems with his eye.

The claimant returned to the ENT Clinic at UMC on November 12, 2013, and the stent was removed.[75] He followed up on December 5, 2013, and it was noted that he was doing well, his eye was clear, and there was no drainage.[76]

On January 9, 2014, the claimant and his mother saw Dr. Legnon.[77] His tremor was improved with the change in the Depakote prescription, and his sleep was good

---

[72]     Rec. Doc. 7-1 at 267.

[73]     Rec. Doc. 7-1 at 266.

[74]     Rec. Doc. 7-1 at 265.

[75]     Rec. Doc. 7-1 at 293.

[76]     Rec. Doc. 7-1 at 292.

[77]     Rec. Doc. 7-1 at 350-351.

with Seroquel, but he admitted to mood swings, paranoia, and auditory hallucinations.

Dr. Legnon also evaluated the claimant's mental functional capacity.[78] She indicated

that the claimant had limitations that were likely to occur up to 25% of the work week

in the areas of understanding and remembering detailed instructions; performing

activities within a schedule, maintaining regular attendance, and being punctual

within customary tolerances; and maintaining socially appropriate behavior and

adhering to basic standards of neatness and cleanliness. She indicated that the

claimant had limitations that were likely to occur from 25% to 50% of the work week

in the areas of accepting instructions and responding appropriately to criticism from

supervisors and getting along with coworkers or peers without distracting them. She

also indicated that the claimant had limitations that were likely to occur more than

50% of the work week in the areas of maintaining attention and concentration for

two-hour blocks of time; working in coordination with or in proximity to others

without being distracted by them; completing a normal work-day and work week

without interruptions from psychologically-based symptoms and performing at a

consistent pace without an unreasonable number and length of rest periods. She

assigned a GAF score of 50. She stated that the claimant had been sober for more

than a year but continued to be symptomatic.

---

[78]     Rec. Doc. 7-1 at 256-257.

On January 14, 2014, the claimant's current diagnosis was updated with a GAF score of 50.[79]   In fact, on April 10, 2015, Dr. Legnon clarified that her records showing a GAF score of 65 for Mr. Broussard were incorrect due to an error that she failed to catch, and that his GAF score should not have been listed as anything above 50 at any time during her treatment of Mr. Broussard.[80]

The claimant returned to see Ms. Milson on February 27, 2014.[81]   They discussed mood swings, agitation, and a recent incident in which he was taken advantage of by a former girlfriend.

On March 7, 2014, Dr. Legnon confirmed her diagnosis of the claimant with Schizoaffective Disorder, Bipolar type.  She stated that Mr. Broussard decompensates quickly under mild stressors and has difficulty being around others without family due to paranoia.  She also opined that she did not expect him to be able to maintain employment for any significant period of time due to his mental illness.[82]

The claimant was examined by Clinical Psychologist Eric R. Cerwonka on May 3, 2014 at the request of Disability Determination Services.[83]   The claimant gave a

---

[79]     Rec. Doc. 7-1 at 258.

[80]     Rec. Doc. 7-1 at 577.

[81]     Rec. Doc. 7-1 at 349.

[82]     Rec. Doc. 7-1 at 469.

[83]     Rec. Doc. 7-1 at 464-467.

history of having left school in the ninth grade because his grades were so low and then working as a deckhand on a jack-up barge for three and a half years before sustaining a head injury in a motor vehicle accident. He reported that the head injury left him in a coma for two weeks, that he returned to work for only one month before quitting due to sexual harassment on the job site, and that he had not worked since 2005. With regard to his mental health, the claimant reported that he was diagnosed with ADHD at the age of ten and began treating with a psychiatrist, Dr. Salama, at the age of eleven for ADHD and depression. He also reported that he received seven days of in-patient psychiatric treatment at the Tyler Mental Health Clinic in 2009 secondary to a suicide attempt, and has remained in out-patient treatment at Tyler ever since. Dr. Cerwonka observed that the claimant had a euthymic mood, no signs of untoward anxiety, and organized, goal-directed thinking. His insight and judgment appeared to be fair. The claimant arrived with his medications, and Dr. Cerwonka counted the pills and concluded that the claimant was not compliant with his medication regimen. Dr. Cerwonka concurred in the diagnoses of Schizoaffective Disorder, Bipolar Type and ADHD, Inattentive Type. Dr. Cerwonka concluded, however, that these disorders would not be expected to prevent the claimant from working. He also opined that, based on the amount of medication that Mr. Broussard brought with him to the evaluation, "it is possible that Mr. Broussard's disorders are

somewhat complicated by less than optimal compliance" Based on the claimant's performance during the examination, Dr. Cerwonka estimated that the claimant functions in the low average to average range of intelligence without significant cognitive deficit. Dr. Cerwonka concluded that "there do not seem to be any psychiatric, cognitive, or behavioral prolems that would prevent Mr. Broussard from engaging in some type of regular, full-time work."

On August 30, 2014, psychologist Dr. Naomi L. Friedberg evaluated the claimant's mental status.[84] She administered an intelligence test that showed Mr. Broussard to be in the borderline range with a full scale IQ of 72. Mr. Broussard was accompanied by his parents for the evaluation. Dr. Friedberg found Mr. Broussard to be a poor historian due to disorganized thoughts and conversation. Deficits in his social skills were apparent in that he spoke loudly, quickly, and excessively at times and had to be redirected to stay on topic. Therefore, his parents had to provide most historical information. His mood and affect were generally neutral and he was cooperative during the interview.

The history provided with regard to Mr. Broussard's mental health started with an ADD diagnosis at age seven, sexual bullying by a neighborhood child that required therapy at age seven, as well as school stressors and behavioral problems. The

---

[84]        Rec. Doc. 7-1 at 549-554.

claimant's mother reported that he was often scared as a young child and reported that he heard voices.

According to the history given to Dr. Friedberg, the claimant was in a motor vehicle accident at the age of twenty in 2003, when his friend was driving while intoxicated. The claimant reportedly sustained a traumatic brain injury as well as other physical injuries. His friend reportedly comitted suicide after the accident, and the claimant's anger and depression increased and his ability to care for himself deteriorated. He then struggled with substance abuse but had reportedly been sober for four years at the time of the evaluation. At that time, he was prescribed Depakote ER, Quetiapine Fumarate, Strattera, Loxapine, and Vistaril.

The history provided to Dr. Friedberg with regard to Mr. Broussard's work history showed that he worked for short periods of time at many different jobs over the years, and that he lost jobs for leaving work during his shift, for buying alcohol for an underage person, for not making it to work as required, and for having a temper tantrum on the job. He left one job voluntarily because he was reportedly being sexually harassed. His last work reportedly was in 2009.

The claimant admitted to Dr. Friedberg that his moods are unstable even on medications and that he occasionally experienced visual and auditory hallucinations. He also admitted occasional suicidal ideation but reported that his paranoia had

improved some in the recent past.  He reported that he had only one friend and needs supervision when out of the house due to poor judgment and impulsivity.

Dr. Friedberg diagnosed the claimant with Shizoaffective Disorder; Polysubstance Abuse, in reported remission of four years; and Borderline Intellectual Disability.  She opined that he can sometimes understand, remember, and carry out simple instructions but his ability to do so is negatively impacted by limited intellectual functioning and unstable, somewhat treatment-resistant, chronic mental illness.  In her opinion, his ability to maintain attention for a two-hour block of time and his ability to sustain effort at a normal pace for a forty-hour work week are negatively impacted by his long history of attention and concentration problems, low intellectual ability, mood disturbance of depression and anxiety, and low tolerance for stress. In her opinion, his long-term mental health treatment and sobriety had only marginal results in increasing his stability.  She opined that he needs supervision when in public and supportive living skills.

The claimant saw his counselor again on November 7, 2014.[85]  He reported hearing voices, paranoid thinking, sleep disturbances, difficulty focusing, and anxiety.

---

[85]     Rec. Doc. 7-1 at 576.

-27-

On December 5, 2014,[86] Mr. Broussard told Ms. Milson that he was sleeping better and not hearing voices as much. He denied paranoid thinking and stated that he was functioning a little better but still having problems with focusing. They discussed Mr. Broussard's relationships with his grandfather and cousin and his need to take his time making friends.

On January 6, 2015, the claimant testified at a hearing regarding his impairments, his functionality, and his mental health treatment. He described his symptoms as including "[p]aranoia, hearing voices, not good with being around other people, always nervous. I just I can't go like to the store, I have to have someone with me. I don't like being around others."[87] He stated that he sees a mental health counselor each month and sees a doctor every three months. He complained that his medications, particularly Loxapine, make him drowsy and that other medications cause tremors in his hands. He stated that his mother helps him with his medications, putting his medications in a seven-day container and reminding him to take his medications as prescribed. He stated that he never completes the tasks his mother asks him to do. Because of his paranoia, he does not go to the grocery store alone. He stated that he does not have any friends, is nervous around people, and cannot get

---

[86]     Rec. Doc. 7-1 at 574.

[87]     Rec. Doc. 7-1 at 38.

along with others. He stated that he has no hobbies and sleeps most of the time. He said that he drives but only with his parents in the car  He reported that he was hospitalized at Tyler Mental Health because of suicidal ideation and has been in out-patient treatment ever since. He stated that he has a dog and a cat but needs reminders to care for them. He also discussed problems with his shoulder and sinuses that resulted from the 2003 motor vehicle accident. He stated that he needs to be reminded to bathe and dress properly, has problems forgetting and misplacing things, and has had conflicts with the neighbors. He admitted to compulsively moving the furniture around in his room. He explained that he tried living away from his parents one time but it did not go well, and he returned to his parents' home. The plaintiff's mother was present at the hearing but she was not permitted to testify.

On April 10, 2015, Dr. Legnon completed a medical source statement regarding the claimant's condition.[88] In the statement, she indicated that she had been treating the claimant since May 2009 and had seen him approximately every three months since then. She diagnosed him with Schizoaffective Disorder, Bipolar Type; ADHD, Social Environment Problems, and Occupational Problems. She stated that his highest GAF score over the past year was 50, and that his current GAF score was also 50. His prognosis was "guarded." In her opinion, he was not a malingerer. She then

---

[88]     Rec. Doc. 7-1 at 578-581.

rated the claimant in the areas of understanding and memory, concentration and persistence, social interaction, and adaptation and judgment by indicating her opinion concerning the claimant's functionality in multiple sub-categories in each of those four general areas of functioning. In the area of understanding and memory, she indicated that the claimant had no limitations in two sub-categories, moderate limitations in one sub-category, and marked limitations in two sub-categories. In the area of concentration and persistence, she indicated that the claimant has moderate limitations in one sub-category, marked limitations in one sub-category, and extreme limitations in three sub-categories. With regard to social interaction, Dr. Legnon opined that she was unable to rate one sub-category, that the claimant had no limitations in one sub-category, moderate limitations in two sub-categories, marked limitations in one sub-category, and extreme limitations in one sub-category. With regard to adaptation and judgment, Dr. Legnon was unable to rate one sub-category, found no limitations in two sub-categories, found mild limitations in one sub-category, moderate limitations in one sub-category, and marked limitations in the final sub-category. Dr. Legnon also stated that the claimant's psychological symptoms routinely interfere with his ability to maintain attention to simple routine tasks at least 20% of an eight-hour day and one day out of a five-day work week. She was unable to determine how often he would likely be absent from work.

Although Mr. Broussard's mother, Janice Broussard, was not permitted to testify at the hearing, she filled out a function report on April 16, 2015.[89] She explained that the claimant requires medication to go to sleep then sleeps the majority of the day, is easily distracted and forgetful, and becomes very frustrated when asked to do something more than once. She stated that he has anxiety, paranoia, and a lack of focus. He drives but only when someone else is with him. She stated that she and her husband never know what kind of mood Mr. Broussard will be in when he wakes up, that he is unable to properly care for his pet, and that he has to be reminded to bathe and dress properly. She stated that she makes sure he takes his medications when he is supposed to. She stated that he is not able to pay bills or handle banking because of a lack of funds, poor judgment, and a lack of focus. She also stated that he does not engage in social activities but isolates himself, going only to doctors' appointments and shopping for food on a regular basis. She stated that he has problems getting along with others. He also has medical problems with his shoulders and eyes. She indicated that Seroquel causes drowsiness and Depakote causes tremors. She stated that Mr. Broussard could hurt himself or others when stressed, and she indicated that his condition has gotten worse over the years.

---

[89]     Rec. Doc. 7-1 at 583-591.

Mr. Broussard now seeks to have the Commissioner's denial of benefits overturned.

ANALYSIS

## A. STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[90] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[91] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[92]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[93] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence

---

[90]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[91]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[92]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[93]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

-32-

or substituting its judgment for that of the Commissioner.[94]  Conflicts in the evidence[95] and credibility assessments[96] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[97]

## B.  ENTITLEMENT TO BENEFITS

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[98]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

---

[94]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[95]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[96]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[97]    *Wren v. Sullivan*, 925 F.2d at 126.

[98]    42 U.S.C. § 1382(a)(1) & (2).

twelve months."[99] A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[100]

## C.    EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled. This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[101]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[102] by determining the most the claimant can

---

[99]     42 U.S.C. § 1382c(a)(3)(A).

[100]    42 U.S.C. § 1382c(a)(3)(B).

[101]    20 C.F.R. § 404.1520.

[102]    20 C.F.R. § 404.1520(a)(4).

still do despite his physical and mental limitations based on all relevant evidence in the record.[103]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[104]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[105]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[106]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[107]  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[108]

---

[103]     20 C.F.R. § 404.1545(a)(1).

[104]     20 C.F.R. § 404.1520(e).

[105]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[106]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[107]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[108]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

## D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since January 14, 2014, the date of his application for benefits.[109]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments: borderline intellectual functioning and schizoaffective disorder.[110]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[111]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations:  he is limited to unskilled work; there must be no strict time limits or production quotas; the work must be performed at a regular rate of performance throughout the day; the work must not require team work or collaboration; the work

---

[109]     Rec. Doc. 7-1 at 19.

[110]     Rec. Doc. 7-1 at 19.

[111]     Rec. Doc. 7-1 at 19.

must not require interaction with the general public and only occasional interaction with coworkers or supervisors.[112]   The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[113]  The claimant does not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from January 14, 2014 (the date of his application for benefits) through March 31, 2015 (the date of the decision) because there are jobs in the national economy that he can perform.[114]  The claimant challenges this finding.

## E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) by failing to properly evaluate his mental impairments; and (2) by failing to properly evaluate the medical opinion evidence.

## F.    DID THE ALJ PROPERLY EVALUATE THE CLAIMANT'S MENTAL IMPAIRMENTS?

The claimant contended that the ALJ erred in failing to properly evaluate his mental impairments, arguing in particular that the ALJ placed an undue reliance on the opinions of a one-time consultative examination, did not give proper

---

[112]    Rec. Doc. 7-1 at 20.

[113]    Rec. Doc. 7-1 at 26.

[114]    Rec. Doc. 7-1 at 26.

consideration to Mr. Broussard's structured family setting, and failed to consider that his symptoms fluctuate over time. This Court finds that the proper evaluative model was followed by the ALJ, that the claimant's arguments actually relate to the amount of weight that the ALJ assigned to the medical opinions, and that the ALJ failed to properly weigh the medical opinion evidence, for the reasons fully explained below.

## G.   DID THE ALJ PROPERLY WEIGH THE MEDICAL OPINION EVIDENCE?

The ALJ is responsible for determining a claimant's residual functional capacity.[115] In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.

This claim was filed before March 27, 2017. Therefore, the medical opinions in the record must be evaluated in accordance with the guidelines set forth in 20 C.F.R. § 404.1527. That statute requires the Commissioner to evaluate every medical opinion received and give a treating physician's opinions controlling weight when they are well-supported and not inconsistent with other substantial evidence in the

---

[115]   *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

record.[116]   Even when a treating physician's medical opinions are not given

controlling weight, the statute requires that they must be weighed in light of the

length of treatment, nature and extent of treatment, supportability, consistency,

specialization, and any other relevant factors.

In this case, Dr. Legnon is the claimant's treating physician, having provided

psychiatric services to Mr. Broussard since 2009.  Therefore, her opinions that are

well supported and consistent with the evidence in the record should have been

afforded controlling weight.  The ALJ did not, however, give controlling weight to

Dr. Legnon's opinions; instead, the ALJ gave "no weight" to Dr. Legnon's opinion

of March 7, 2014, in which she opined that Mr. Broussard would be unlikely to

maintain employment for a significant period of time due to his mental illness,

arguing that whether the claimant is able to work is a determination reserved to the

Commissioner. This was an appropriate finding by the ALJ.  However, Dr. Legnon

completed an assessment of Mr. Broussard's functional capacity on January 9, 2014.

The ALJ agreed with the opinions set forth there and accepted them "as accurate

when issued and consistent with reports of changes in medications."  But the ALJ

discounted Dr. Legnon's opinions by finding that Mr. Broussard's condition had

---

[116]    See, also, *Jones v. Colvin*, 638 Fed. App'x 300, 303 (5th Cir. 2016); *Greenspan v. Shalala*, 38 F.3d at 237; *Scott v. Heckler*, 770 F.2d at 485.

deteriorated before Dr. Legnon expressed her opinions and then improved thereafter. The record is clear that the symptoms of the type of chronic mental illness with which Mr. Broussard suffers fluctuate over time. Sometimes he is suicidal, sometimes he is not; sometimes he is paranoid, sometimes he denies paranoid thinking; sometimes he has auditory hallucinations, sometimes he denies hearing voices. It was inappropriate for the ALJ to discount Dr. Legnon's opinions on the basis that it might have been rendered on a "bad day" rather than on a "good day." To the contrary, Dr. Legnon's opinions were informed by her longitudinal treatment of Mr. Broussard's symptoms, impairments, and functional capacity, since she has been his treating psychiatrist for several years.

Furthermore, the ALJ rejected Dr. Legnon's opinions in favor of Dr. Cerwonka's opinions even though Dr. Cerwonka saw the claimant on only one occasion. If that was one of Mr. Broussard's "good days," then Dr. Cerwonka's opinions should have been discounted by the same logic that the ALJ applied to Dr. Legnon's opinions.

The ALJ also discounted the opinions of Dr. Friedberg, who generally agreed with Dr. Legnon's conclusions. The ALJ gave no weight to Dr. Friedberg's opinions, first because she allegedly did not conduct an actual mental status examination and, second, because she allegedly failed to consider Dr. Cerwonka's opinion that Mr.

Broussard was noncompliant with his medications. With regard to the alleged lack of objective testing to support Dr. Friedberg's opinions, the ALJ said that Dr. Friedberg found the claimant's ability to sustain attention was greatly impacted negatively based on the history provided yet the formal testing showed his working memory is in the low average range. In fact, however, Dr. Friedberg actually said that the claimant's ability to sustain attention would be negatively impacted not only by his long history of attention and concentration problems but also by his low intellectual ability, his mood disturbances of depression and anxiety, and his low tolerance for and frustration with stress. The testing showing that his working memory is in the low average range is relevant but not dispositive of this issue.

The ALJ also discounted Dr. Friedberg's opinions because she allegedly did not find any evidence of inattention during the testing process. In fact, however, Dr. Friedberg noted that Mr. Broussard "had to be redirected frequently to stay on topic," evidencing her conclusion that he has difficulty with focus, concentration, and inattention.

The ALJ also found that Dr. Friedberg's finding that the claimant requires supervision in public and supportive living skills was inconsistent with the GAF score assigned by Dr. Legnon. However, this criticism of Dr. Friedberg's opinion ignores the evidence in the record establishing that Mr. Broussard had a very bad

experience when he attempted to live independently, drives only when accompanied by someone else, goes into a store only with one or both of his parents, and requires his parents' assistance in preparing meals, caring for his pets, attending to his personal hygiene and grooming, and taking his medications as prescribed. The ALJ failed to explain how a GAF score of 50, which indicates serious symptoms such as suicidal ideation, a lack of friends, or the inability to keep a job, is inconsistent with the claimant's need for such supervision and support.

Additionally, the ALJ seemed to agree with Dr. Cerwonka's finding that Mr. Broussard was not compliant with his medications, and she criticized Dr. Friedberg for failing to consider the effects of the claimant's noncompliance with treatment. There are two reasons why Dr. Cerwonka's finding in that regard is not supported by substantial evidence in the record. First, the record is replete with references to Mr. Broussard confirming to his counselor and his psychiatrist that he took his medication as prescribed, and there is no indication in any of the records from Tyler Mental Health that he was ever suspected of noncompliance or determined to be noncompliant with his medication regimen. Second, the record supports the conclusion that Mr. Broussard's mother took over the responsibility of ensuring that her son took his medication as prescribed, placing his medications in a weekly dispenser, reminding him when his medications should be taken, and giving him

additional medications when necessary to deal with his symptoms. The ALJ erred in placing so much emphasis on Dr. Cerwonka's conclusion, which is not supported by substantial evidence in the record, that Mr. Broussard was not compliant with his medications and erred again in discounting Dr. Friedberg's opinions on that basis, and this Court finds that the reasons given by the ALJ for discounting Dr. Friedberg's opinions are not supported by substantial evidence in the record.

This Court finds that, in weighing the opinions of the various medical sources, the ALJ applied an improper legal standard by placing undue reliance on a non-examining source, which led to findings on residual functional capacity and disability that are not supported by substantial evidence. This Court further finds that the ALJ should have given controlling weight to the opinions of Dr. Legnon and erred in giving no weight to the opinions of Dr. Friedberg. Additionally, the ALJ did not have an opportunity to review Dr. Legnon's opinions set forth in her medical source statement of April 10, 2015, which was added to the record after the ALJ's ruling. Accordingly, this Court recommends that this matter be remanded for a proper weighing of medical opinions, another evaluation of the claimant's residual functional capacity, and another decision concerning Mr. Broussard's alleged disability.

**IT IS THE RECOMMENDATION** of this Court that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to properly evaluate and weigh the medical opinion evidence and to again evaluate the claimant's residual functional capacity. The claimant should be afforded the opportunity to submit updated medical evidence and to testify at another hearing. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[117]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[117] See, *Richard v. Sullivan*, 955 F.2d 354 (5ᵗʰ Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[118]

Signed in Lafayette, Louisiana, this 6th day of November 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[118]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).